## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

RICHARD LABAT

                                                 CIVIL ACTION

VERSUS

                                              NO. 21-690-JWD-EWD

SHELL PIPELINE COMPANY, LP

### RULING AND ORDER

I.    **INTRODUCTION**

This matter comes before the Court on *Shell's Motion for Summary Judgment* (the "*MSJ*") (Doc. 14) filed by Defendant, Shell Pipeline Company LP ("Defendant" or "Shell"). Plaintiff Richard Labat ("Labat" or "Plaintiff") opposes the motion, (Doc. 18), and Shell has filed a reply, (Doc. 19). Oral argument is not necessary.

Are Plaintiff's claims preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA")? That is the heart of this case.

Labat says he brings claims of detrimental reliance/promissory estoppel and fraud. According to Plaintiff, both are governed by Louisiana state law.

But Shell maintains that state law cannot apply because there is either "complete preemption" or "conflict preemption." The former is triggered when a plaintiff's claim could have been brought under ERISA's civil enforcement provision and when the defendant's conduct does not implicate any other independent legal duty. The latter applies when the state law "relates to" any employee benefit plan.

Having carefully considered the law, facts in the record, and arguments and submissions of the parties, the Court finds that there are both kinds of preemption in this case. As a result, the *MSJ* will be granted, though Plaintiff will be given leave to amend to allege viable ERISA claims.

## II.    Relevant Factual Background[1]

### A.  Preliminaries about the Plan and the Amendment at Issue

The Shell Oil Company Compressive Welfare Benefits Plan (the "Plan") is governed by ERISA. (*Joint Stipulation Pursuant to Limited Scheduling Order*, Doc. 11 at 1; *Shell's Filing Pursuant to Limited Scheduling Order*, Doc. 9; Plan, Doc. 9-1.)  Section 2.1 of the Plan provides: "The Company has adopted and established the Plan for the purpose of providing the benefits under and coordinating the administration of the Component Programs, which provide certain health, wellness, accident, life, disability, and other welfare benefits for Employees and their Dependents, where applicable." (*SUMF* ¶ 1, Doc. 14-1.)

The Plan Sponsor is Shell USA, Inc. (f/k/a Shell Oil Company). (Plan §§ 1.1(o), 2.1, Doc. 9-1 at 8, 22; *Ebbinghaus Decl.* ¶ 5, Doc. 14-3 at 2; *SUMF* ¶ 3, Doc. 14-1.)   The Plan is not only applicable to Shell USA, Inc. employees, as certain other Shell-affiliated companies are permitted to adopt the Plan and become Participating Employers under the Plan, and these companies' employees are entitled to participate in the Plan, subject to its terms. (*SUMF* ¶ 4, Doc. 14-1.)

Shell Pipeline Company LP ("Shell") adopted the Plan and is a Participating Employer under the Plan. (*Id.* ¶ 5.) Employees covered by the Plan are referred to as Participants. (*Id.* ¶ 6.)

The Plan Administrator is Shell USA, Inc., which acts through Todd Ebbinghaus. (*Id.* ¶ 9.) In his role as the Plan Administrator, Ebbinghaus has access to the company's records regarding

---

[1] Most of the facts in this section come from Shell's *Statement of Undisputed Material Facts in Support of [MSJ]* ("*SUMF*") (Doc. 14-1). In *Plaintiff's Response to the [SUMF]* ("*PRSUMF*") (Doc. 18-3), Plaintiff does not dispute most of these facts; he simply object on other grounds, such as relevance. (*See, e.g., id.* ¶ 4.)  Where the *SUMF* is cited, that fact is either undisputed or uncontradicted in such a way as to deem the fact admitted. *See* M.D. La. Civ. R. 56(f) ("Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted.").

the Plan, and he makes decisions interpreting the Plan and awarding or denying claims for benefits under the Plan. (*Id.* ¶ 10.)

This case centers on a January 1, 2006, amendment to the Plan that changed the method for subsidizing premiums for retiree medical coverage for Participants based on their date of hire by a Participating Employer. (*SUMF* ¶ 15, Doc. 14-1.)  Specifically, the January 1, 2006, amendment provided different retiree medical premium subsidy methods for Participants hired or rehired *before* January 1, 2006 ("the pre-2006 subsidy formula") from those for Participants hired or rehired *on or after* January 1, 2006 ("the 2006 subsidy formula"). (*Id.* ¶ 16.)

The pre-2006 subsidy formula provides that each year a Participant elects medical coverage in retirement, the Participant will have their elected level of coverage subsidized by the employer at a specified rate that is based on the Participant's years of Accredited Service. (*Id.* ¶ 24.) For example, Participants with between 10 and 24 years of Accredited Service at the time of retirement will have retiree medical coverage subsidized at a rate of 70% of the maximum employer subsidy for a given plan year. (*Id.*)

Under the 2006 subsidy formula, a Participant's Retiree Medical Supplemental Account ("RMSA") balance is determined at the time of retirement and represents the maximum amount of the employer's contribution to the cost of retiree medical coverage under the Plan for the remainder of the Participant's retirement. (*Id.* ¶ 25.)  The Participant gets to decide how much of their RMSA balance to apply to retiree medical premiums each year that they elect coverage in retirement. (*Id.* ¶ 26.)  A RMSA balance is calculated by multiplying certain factors.[2] (*Id.*)

---

[2] Those factors include:

    a.  "➢ Your completed years and months of *accredited service* between the ages of 40 and 60, divided by 20;

    b.  ➢ The annual premium for the *participant plus spouse/domestic partner* level of coverage for the [US PPO option] at the time of your retirement;

**B. Plaintiff's Employment and Severance**

Plaintiff Richard Labat was hired by Shell on September 18, 2006. (*SUMF* ¶ 27, Doc. 14-1.) When Labat was hired by Shell, he became a participant in the Plan. (*Id.*; *see also Ebbinghaus Decl.* ¶¶ 5–7, Doc. 14-3 at 2; *SUMF* ¶¶ 3–5, Doc. 14-1.)

Before being hired by Shell, Labat was employed by LOOP, LLC ("LOOP") from September 29, 1992, until September 2006. (*Id.* ¶ 28.) LOOP is a joint venture in which a Shell-affiliated entity participated. (*Id.* ¶ 29.) "However, LOOP has never been a Participating Employer under the Plan." (*Id.* ¶ 30.)

In 2020, Shell faced a need to reduce its workforce. (*Id.* ¶ 32.) According to Shell, before implementing layoffs, Shell offered employees, including Labat, an opportunity to participate in a Special Severance Plan. (*Ebbinghaus Decl.* ¶ 22, Doc. 14-3.) The parties dispute whether this document was governed by ERISA, (*compare id. and* Special Severance Plan, Doc. 14-3 at 17–20, *with PRSUMF* ¶ 33, Doc. 18-3), and the Court will have more on this below.

Suffice it to say for now, Labat applied to be included in this Special Severance Plan, and his application was accepted, giving Labat the right to consider and accept or reject the opportunity to retire and receive a severance payment. (*SUMF* ¶ 34, Doc. 14-1.) According to Shell, Labat received certain documents from Fidelity[3] which showed his "Eligibility Service" and his "Accredited Service" for purposes of the Plan. (*Ebbinghaus Decl.* ¶ 24, Doc. 14-3 (citing *Your Pension Benefit Modeling Statement*, Doc. 9-14 at 6).) Plaintiff disputes that he received such

---

c. ➢ The historical five-year average rate of premium increase to the [US PPO option], based upon the year of your retirement plus the four previous years, expressed as a percentage;

d. ➢ The numeric value of five; and

e. ➢ 80% (.80).

(*SUMF* ¶ 26, Doc. 14-1.)

[3] It is undisputed that Fidelity is a third-party recordkeeper for the Plan and has no authority to alter the terms of the Plan, interpret the Plan, or make decisions with respect to claims for benefits under the Plan. (*SUMF* ¶ 54, Doc. 14-1.)

documents before his decision to take early retirement, (*see PRSUMF* ¶ 35, Doc. 18-3), but this dispute is not material to the instant motion.

In any event, these documents show different time periods for these two types of service, and as of mid-2020 they showed that Labat's years of Eligibility Service far exceeded (were nearly double) his years of Accredited Service. (*Ebbinghaus Decl.* ¶ 24, Doc. 14-3.)[4]  Plaintiff acknowledges that the large difference between Labat's Eligibility Service and his Accredited Service is due to the fact that his Eligibility Service includes the time that he was employed by LOOP, whereas his Accredited Service is calculated from the date he was hired by a Participating Employer, Shell. (*SUMF* ¶ 38, Doc. 18-3.)

Defendant submits evidence that, "In exchange for retiring effective September 30, 2020[,] and executing a Waiver, Release, Promise and Settlement Agreement, Labat was given a severance payment of $202,650. In the Waiver, Release, Promise and Settlement Agreement, Labat expressly waived 'claims for, *inter alia*, emotional distress, mental suffering, fraud, and promissory estoppel.' " (*Ebbinghaus Decl.* ¶ 26, Doc. 14-3.)   Plaintiff says this is a statement of law and that, further, the "Special Severance Plan is invalidated as a result of [Shell's]" fraud. (*PRSUMF* ¶ 39, Doc. 18-3.)  The Specifical Severance Plan contradicts Defendant's position in a number of ways.[5]

---

[4] Plaintiff objects to the first part of the statement as "nonsensical," (*PRSUMF* ¶ 36, Doc. 18-3), but no evidence is provided to rebut this fact.

[5] Specifically, again, the Special Severance Plan contains broad language acknowledging that Plaintiff read the agreement, received the payment in consideration for it, and waived all claims arising from his employment, including those for fraud and promissory estoppel. (Special Severance Plan, Doc. 14-3 at 21.)  Further, the Special Severance Plan is signed and acknowledged by Plaintiff:

In any event, after he retired, Labat was notified of the amount of his premiums for medical coverage under the Plan and the amount the Plan would contribute to his RMSA, which were dictated by the provisions applicable to medical benefits for Participants such as him who were hired or rehired by a Participating Employer *on or after* January 1, 2006. (*SUMF* ¶ 41, Doc. 14-1.)

### C.  Plaintiff's Appeal to the Plan Administrator

Labat claimed that he should receive the pre-2006 subsidy formula because his recognized hire date for Plan purposes should be the date he was hired by LOOP in September 1992 rather than the date he was hired by Shell Pipeline in September of 2006. (*SUMF* ¶ 42, Doc. 14-1.)  Labat asserted his claim for the pre-2006 subsidy formula in an appeal letter to the Plan Administrator in November 2020. (*Id.* ¶ 43.)  Labat's letter opens with the following statement: "I would like to officially appeal this decision / conclusion that I fall into the Jan 1, 2006 rule for retirement and benefits. I am requesting that I should be part of the pre Jan 1, 2006 retiree and benefits plan." (*Id.* ¶ 44.)  Labat's letter and the documents he submitted were considered and his claim was rejected because the terms of the Plan, as reflected in the Summary Plan Description documents ("SPDs") and the Summary of Material Modifications ("SMMs"), establish that, due to his

---

By executing this Agreement, I fully and voluntarily agree to all the terms set forth in this Agreement, without duress, coercion, or undue influence, and with full and free understanding of its terms, after having a reasonable period of time to review and deliberate regarding its meaning and effect.

**Please confirm if this is your Last Day on Payroll:**   [x] YES    [ ] NO

Date: 9/30/2020

Name (Signature): *Richard L Labat Jr.*

Employee ID: 089507

Richard L Labat Jr.
Name (Print)

(*Id.* at 23.)

Accredited Service and his September 18, 2006, hire date with a Participating Employer, the only retiree medical subsidy to which he is entitled is under the 2006 subsidy formula. (*Id.* ¶ 45.)

Labat's counsel later made a second appeal to the Plan Administrator, asserting the same claim, on February 9, 2021. (*Id.* ¶ 46.) The Plan Administrator carefully considered this appeal, and the attached documents, as well. (*Id.* ¶ 47.) In his letter to Labat's counsel dated April 5, 2021, the Plan Administrator cited specific provisions of the SMMs and the SPDs on which the Plan Administrator's denial of this appeal was based. (*Id.* ¶ 48.) The provisions cited in the Plan Administrator's letter confirm that Mr. Labat's September 18, 2006, hire date with a Participating Employer and Accredited Service dictate that the retiree medical premium subsidy available to Labat under the Plan is the 2006 subsidy formula. (*Id.* ¶ 49.) The Plan Administrator's letter also advised Labat of his right to file suit under ERISA and of ERISA's broad preemption of state law claims related to ERISA plans. (*Id.* ¶ 50.)

Labat has been receiving since the time of his retirement on September 30, 2020, and continues to receive the maximum retiree medical premium subsidy to which he is entitled under the terms of the Plan. (*Id.* ¶ 51.) The 2006 subsidy formula has been uniformly and consistently applied to employees who were hired or rehired by a Participating Employer after January 1, 2006, including employees similarly situated to Labat. (*Id.* ¶ 52.)

### D.  Labat's Claims and Evidence

Again, in his *Petition*, Plaintiff pleads state law claims for detrimental reliance/promissory estoppel, (*Pet.* ¶ 19–20, Doc. 1-1 at 8), and fraud, (*id.* ¶ 21–26, Doc. 1-1 at 9). Labat submits a declaration in support of his claims, (*Labat Decl.*, Doc. 18-1), and most of the following facts taken from that document are nearly identical to what is contained in the *Petition*. (*Compare Pet.* ¶¶ 8–12, 14–18, Doc. 1-1 at 6–8, *with Labat Decl.* ¶¶ 8–17, Doc. 18-1.)

Specifically, Labat states that he never received the July 1, 2006, amendment which provided a different retiree medical premium subsidy methods for Participants under the pre-2006 subsidy formula and the 2006 subsidy formula. (*Labat Decl.* ¶ 4, Doc. 18-1.)  Further, he states that this amendment was never explained to him in a SSM to the SPD issued in July 2006 because he never received it nor was he provided a copy. (*Id.* ¶¶ 5–6.)

Labat also states that, before deciding to take early retirement and execute the Special Severance Plan, he "doggedly sought to verify that [his] date of hire for purposes of the . . . agreement was [his] September 29, 1992 hire date by LOOP, LLC . . . including for such purposes as for allowance to continue in [his] [Shell]-sponsored medical plan." (*Id.* ¶ 8; *see also Pet.* ¶ 8, Doc. 1-1 at 6.)  According to Labat, Shell's human resources promised him that his "twenty-eight (28) years of service would apply to health care, retirement and severance." (*Labat Decl.* ¶ 9, Doc. 18-1; *see also Pet.* ¶ 9, Doc. 1-1 at 6.)  Labat declares:

> I repeatedly sought clarification of the issue and Shell Pipeline Company, LP, through its HR representative Julia Reyes stated in no uncertain terms that my service date for insurance benefit purposes was twenty-eight (28) years as of September 29, 2020. Specifically, Ms. Reyes stated:
>
> *Hi Ritchie,*
> *Per checking, you are pension eligible in our tracker and will reach 28 years of service on September 29. You may want to call Fidelity and inform them. Once you call them, please ask for a reference/ticket number so in case we need to escalate we have a reference. Thank you!*
> *Regards,*
> *Julia*

(*Labat Decl.* ¶ 10, Doc. 18-1; *see also Pet.* ¶ 10, Doc. 1-1 at 6–7.)  Plaintiff "had nine Fidelity Service Tickets regarding the issue prior to [his] execution of the Severance Agreement which, again, were silent as to the amount of service to be used when calculating [his] qualifications for health insurance." (*Labat Decl.* ¶ 11, Doc. 18-1; *see also Pet.* ¶ 11, Doc. 1-1 at 7.)

Plaintiff attests and pleads:

> Based upon Shell['s] . . . statements and assurances that for purposes of the Special Severance Plan's eligibility for continued participation in a Company-sponsored medical plan with the Company premium contribution for coverage which I had in effect immediately prior to separation from my employment pursuant to my voluntary resignation, on September 30, 2020, I executed the Special Severance Plan.

(*Labat Decl.* ¶ 12, Doc. 18-1; *see also Pet.* ¶ 12, Doc. 1-1 at 7.)  Later, on October 23, 2020, Julia Reyes of Shell "confirmed that the Fidelity pension team had confirmed" Labat's understanding of the earlier "1992 effective date of service." (*Labat Decl.* ¶ 13, Doc. 18-1; *see also Pet.* ¶ 14, Doc. 1-1 at 7.)  "Specifically, Ms. Reyes stated, 'The Fidelity Pension Team has confirmed they have your correct service dates.' " (*Labat Decl.* ¶ 13, Doc. 18-1; *see also Pet.* ¶ 14, Doc. 1-1 at 7.)

Plaintiff says that it was only after he executed the Special Severance Plan that Shell, for the first time, argued that, for purposes of the Plan his hire date would be deemed September 18, 2006, and not the 28 years they had previously represented. (*Labat Decl.* ¶ 14, Doc. 18-1; *see also Pet.* ¶ 15, Doc. 1-1 at 7.)  Nevertheless, after this "contradict[ion]," on November 2, 2020, Shell's VP Pipeline of Operations, Jessie Stanley, "interceded on [Labat's] behalf to HR Operations and Ms. Reyes stating:"

> *Please can I ask that this case be escalated and reassigned. It is crazy that I have an employee chasing this issue for months now and considerable financial burden now has been encountered. I would like to see this week an effective resolution of the case - there have been too many emails 'working it'. We have chains and chains of emails and a former member of my team is spending hours chasing this down. We clearly need to ensure with Fidelity that Richard's 80 points are considered in his insurance.*
>
> *Please act immediately.*
>
> *Thanks, Jess*

(*Labat Decl.* ¶ 15, Doc. 18-1; *see also Pet.* ¶ 16, Doc. 1-1 at 7–8.)  Despite this, on December 1, 2020, Shell denied Labat's appeal. (*Labat Decl.* ¶ 16, Doc. 18-1; *see also Pet.* ¶ 17, Doc. 1-1 at 8.)

Critically, Labat avers and pleads:

> As a result of Shell['s] . . . change in my stated date of hire for purposes of calculating my eligibility for continuance of a Company-sponsored medical plan there was a $93,000 shortfall for what I had budgeted for my future health insurance based upon the representations i.e. promises of Shell . . . .

(*Labat Decl.* ¶ 17, Doc. 18-1; *see also Pet.* ¶ 18, Doc. 1-1 at 8.)

## III.   RULE 56 STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[ ] [ ] citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Thus, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original))).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citing *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (cleaned up). The non-mover's "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (cleaned up).

Additionally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (citing, *inter alia*, *Raugas*, 136 F.3d at 458). *See also Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered" (cited with approval by *Malacara*)); *see also* M.D. La. Civ. R. 56(f) ("The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."); *cf. United State v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Ultimately, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

11

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion. Indeed, even if the moving party comes forward with an abundance of evidence supporting its theory of the case, the nonmoving party may nevertheless defeat the motion by countering with evidence of its own, which, if credited by the fact-finder, would entitle the nonmoving party to a verdict in its favor. Or, the non-moving party can defeat the motion by demonstrating that the evidence tendered by the moving party is itself laced with contradictions of [material] fact.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (cleaned up).

## IV.   DISCUSSION

### A.   Parties' Arguments

#### 1. Defendant's Original Memorandum (Doc. 14-2)

Shell begins its argument by focusing on complete preemption. (Doc. 14-2 at 13.) According to Shell, complete preemption applies when "a remedy falls within the scope of or is in direct conflict with ERISA § 502(a), and therefore is within the jurisdiction of federal court." (*Id.* (citations omitted).)  That occurs when (1) plaintiff could have brought his claim under ERISA § 502(a), and (2) defendant's conduct does not implicate any other independent legal duty. (*Id.* at 14 (citations omitted).)  Here, both of these requirements are satisfied; Plaintiff is essentially seeking to recover benefits under the Plan, which falls within § 502(a), and his claim requires an interpretation of the Plan. (*Id.* at 14–16.)  Thus, regardless of how his claim is phrased, it falls under ERISA's civil enforcement provision and is thus preempted. (*Id.* at 16.)

Shell then turns to conflict preemption. (*Id.* at 17.)  According to Shell, conflict preemption applies when a state law "relates to any employee benefit plan"—that is, "it has a connection with or reference to such a plan." (*Id.* at 17 (citations omitted).)  If a state law claim requires "the

interpretation and administration of an ERISA plan," then there is conflict preemption. (*Id.* (citations omitted).)  Shell asserts:

> The Fifth Circuit considers two factors in determining whether a state claim "relates to" an employee health benefit plan: "(1) whether the state law claims address areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) whether the claims directly affect the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *King v. Bluecross Blueshield of Alabama*, 439 F. App'x 386, 389 (5th Cir. 2011) (quoting *Woods v. Tex. Aggregates, L.L.C.*, 459 F.3d 600, 602 (5th Cir. 2006)).

(*Id.* at 18.)

Here, "Labat's state law claims address an area of exclusive federal concern, namely, the right to receive benefits under the Plan. . . . This entire case revolves around the Plan." (*Id.* at 18 (citations omitted).)  The Court must interpret the Plan to determine if Shell made a "misrepresentation" about Labat's years of service, and the Court must refer to the Plan to assess Labat's damages. (*Id.* at 19 (citations omitted).)  Both of these "related to" the Plan. (*Id.*)  "Additionally, the right to receive benefits under the Plan impacts the relationship among traditional ERISA entities, namely, (1) the Plan, (2) Labat's former employer (a Participating Employer in the Plan), and (3) Labat (a Plan Participant)." (*Id.* (citations omitted).)  "Labat cannot plausibly argue that his claims bear no relation to the Plan," so his "state law claims must be dismissed as conflict preempted because they relate to an employee benefit plan under ERISA § 1144(a)." (*Id.* at 20.)

Shell then asserts that Labat should not be allowed to amend his claims because any such amendment would be futile. (*Id.*)  While § 502(a) gives a participant the ability to bring an action to recover benefits due under his plan, "Labat has received and continues to receive the maximum retiree medical subsidy for which he is eligible under the Plan. (*Id.*)  Shell then provides a lengthy

discussion of *Kersh v. UnitedHealthcare Insurance Co.*, 946 F. Supp. 2d 621 (W.D. Tex. 2013),

where the district court purportedly found conflict preemption and denied leave to amend as futile.

(Doc. 14-2 at 19–22.) Shell then argues:

> Like in *Kersh*, Labat does not and cannot argue that the Plan
> Administrator incorrectly calculated his retiree medical subsidy; he
> simply asserts that the subsidy is less than what he himself had
> calculated based on his belief that his hire date "for purposes of the
> Plan" was September 1992 and not September 2006. . . . [B]ecause
> the plain terms of the Plan do not entitle Labat to the benefits he
> seeks, it would be futile for him to amend his claims.

(Doc. 14-2 at 22–23.) According to Shell, since Plaintiff has no remedy under the Plan, his only

option is an ERISA estoppel claim, but Plaintiff cannot prevail on this either as (1) there was no

"material misrepresentation"; (2) even if there was, any reliance would not be reasonable or to his

detriment; and (3) there are no extraordinary circumstances. (*Id.* at 23–31.) For all these reasons,

Shell seeks dismissal of Labat's claim with prejudice. (*Id.* at 31.)

### *2. Plaintiff's Opposition (Doc. 18)*

Labat's position is summarized in the opening pages of his brief as follows:

> Shell's Motion for Summary Judgment is an invitation to go down
> a 30-page rabbit hole which is based upon a false premise that Mr.
> Labat's claims are related to [the Plan.] An analysis of Mr. Labat's
> Petition for Damages reveals that he neither makes any claims that
> the Plan is being administered incorrectly nor does he seek increased
> benefits from the Plan. What Mr. Labat seeks is damages pursuant
> to his state law claims for detrimental reliance/promissory estoppel
> and fraud. As Mr. Labat's Petition for Damages makes clear, Mr.
> Labat is only seeking damages based upon the statements and
> promises made by Shell prior to inducing [him] to enter into an early
> retirement. Mr. Labat also seeks damages pursuant to Louisiana
> Civil Code Article 1953 based upon Shell's false statements,
> misrepresentations of material fact and its suppression of truth in its
> communications with Mr. Labat leading up to the execution of the
> severance agreement. Again, Mr. Labat's Petition for Damages is
> devoid from a single allegation asserting that either Shell or the Plan
> Administrator has misapplied or misinterpreted the Plan upon which
> Shell is so steadfastly focused. Further, Mr. Labat['s] Petition for

> Damages does not reference [ ] the language of the Plan in any way.
> By viewing Mr. Labat's Petition for Damages through a false lens,
> Shell seeks to entirely dismiss Mr. Labat's claims.[ ] Shell's motion
> in no way addresses, much less denies, the fact that Mr. Labat was
> the victim of Shell's misrepresentations, assurances and promises
> made to him regarding what he would be entitled to in exchange for
> inducing him to execute the severance agreement at issue. Because
> Mr. Labat's claims do not in any way relate to an employee welfare
> benefit plan as defined by Section 3(1) of [ERISA], and solely assert
> state law claims of detrimental reliance and fraud, Shell's motion
> must be denied.

(Doc. 18 at 1–2.)

More specifically, Plaintiff first contends there is no complete preemption because Plaintiff is not asserting any civil enforcement action to receive benefits due to him under the Plan. (*Id.* at 8.) As to conflict preemption, Labat says there is none because his claims "do not address an area of exclusive federal concern," and he does not "seek the right to receive benefits under the Plan[.]" (*Id.* at 11; *see also id.* at 10–11.) Rather, he "is seeking damages pursuant to detrimental reliance relating to statements made by Shell to him in order to induce him into entering a Special Severance Plan and early retirement. Nowhere does Mr. Labat assert that Shell violated the terms of the Plan at issue[.]" (*Id.* at 11.) Further, Plaintiff "is not claiming that Shell violated the terms of the Special Severance Plan." (*Id.*) Rather, Shell made intentional misrepresentations to entice him into retiring. (*Id.* at 11–12.) Moreover, this case does not impact the relationship between traditional ERISA entities because, again, he does not seek benefits or make claims under the Plan. (*Id.* at 12.)

Next, Plaintiff argues that his claims should not be dismissed because there is no preemption. (*Id.*) "Mr. Labat does not seek to amend his claims," and he "is not seeking to assert an ERISA estoppel claim." (*Id.*) Again, he is not asserting claims under the Plan, so there is no need to address the futility analysis. (*Id.*) "Mr. Labat is seeking to and has asserted state law claims

related to promissory estoppel and fraud regarding the representations made to him in Shell's attempts to induce him to enter into an early retirement and execute the Special Severance Plan." (*Id.* at 12–13.)  Plaintiff then devotes a lengthy discussion to certain cases cited by Defendant in its original memorandum, (*id.* at 13–19), before once again urging there is no preemption, (*id.* at 19–20).

### *3. Defendant's Reply (Doc. 19)*

In reply, Shell first focuses on certain admissions by Labat, namely (1) that Shell did not deny him any benefits under the Plan; and (2) that Shell did not violate the Special Severance Plan, and he is not entitled to additional benefits under same. (Doc. 19 at 1.)  Contrary to Plaintiff's position:

> Labat's assertion that his claims "arise out of the false statements made to him **as it relates to his date of hire for purposes of his severance agreement and its application to health care, retirement and severance"** conclusively demonstrates that, despite Labat's denials, it is indisputable that his claims arise out of and relate to the Plan. Indeed, the only relevance of Labat's date of hire to the instant matter is **as it relates to his eligibility for medical benefits under the Plan.**

(*Id.* at 2.)  Defendant next rebuts the various efforts by Plaintiff to distinguish its cases. (*Id.*)  Shell then asserts:

> Labat's claim that he is not seeking benefits under the Plan is belied by his own damages calculation. In his Declaration, Labat states:
>
>> [ [ ] As a result of [Shell's] change in my stated date of hire for purposes of calculating my eligibility for continuance of a Company-sponsored medical plan there was a $93,000 shortfall for what I had budgeted for my future health insurance based upon the representations i.e. promises of [Shell].]
>
> The fact that Labat's damages calculation – reasserted in his Opposition – **is based upon what Labat believed he was entitled to receive under the Plan** and what he actually received upon his

16

> retirement confirms that he is essentially seeking benefits under the
> Plan. That Labat has framed the damages he seeks as being
> "pursuant to detrimental reliance" does not change the fact that they,
> and his entire pitch in this case, relate back to the Plan.

(*Id.* at 2–3.)  In any event, according to Shell, Labat has failed to produce evidence of an intent to

defraud. (*Id.* at 3.)

Next, Shell contends that dismissal is warranted because Plaintiff admitted that (1) he does

not seek to amend his petition, and (2) he is not asserting a ERISA estoppel claim. (*Id.* at 4 (citing

Doc. 18 at 12).)  Shell then addresses the caselaw which Shell originally cited and which Plaintiff

attempts to distinguish. (*Id.* at 4–5.)

Shell next turns to the evidence.  Labat's declaration is, according to Shell, simply a self-

serving and conclusory recitation of the allegations of the *Petition.* (*Id.* at 5–6.)  Further, Labat

admits most of the facts in the *SUMF*, and those facts which are denied should be deemed admitted.

(*Id.* at 6–8.)  Even more importantly, Plaintiff admitted certain facts which make summary

judgment appropriate. (*Id.* at 9.)

Shell closes:

> Regardless of how he frames his claims, Labat seeks benefits
> pursuant to a Shell-sponsored medical plan that is governed by
> ERISA. His claims are completely preempted by ERISA under §
> 502(a)(1)(B), "regardless of how artfully pleaded as a state action."
> *Kersh*, 946 F. Supp. 2d at 630. His claims are also conflict
> preempted because they "relate to" an employee benefit plan under
> § 514(a). The fact that this case should proceed under an ERISA
> framework, and not as an ordinary civil proceeding, is beyond
> dispute. Labat has failed to raise a genuine issue of material fact,
> and the Court should grant Shell's Motion, apply the relevant
> ERISA principles cited in Shell's original and reply memoranda,
> and dismiss Labat's claims with prejudice.

(*Id.* at 10.)

### B. Complete Preemption

#### 1. Applicable Law

" '[T]here are two types of preemption under ERISA': complete and conflict." *Ford v. Freemen*, 388 F. Supp. 3d 692, 698 (N.D. Tex. 2019) (quoting *Giles v. NYLCare Health Plans, Inc.*, 172 F.3d 332, 336 (5th Cir. 1999)).  "The scope of complete and conflict preemption under ERISA are very similar but not exactly the same." *Id.* at 699 (citing *Woods v. Tex. Aggregates, L.L.C.*, 459 F.3d 600, 603 (5th Cir. 2006)).

"Complete preemption under ERISA stems from § 502(a), codified at 29 U.S.C. 1132(a), which sets forth a comprehensive civil enforcement scheme." *Id.* (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)).  "The effect of complete preemption is that 'any state-law cause of action that duplicates, supplements, or supplants' this scheme conflicts with the congressional intent to make ERISA an exclusive remedy, 'and is therefore pre-empted.' " *Id.* (quoting *Davila*, 542 U.S. at 209).

"The Supreme Court has established a two-part test for determining when ERISA completely preempts a state-law claim." *Advanced Physicians, S.C. v. Nat'l Football League*, 859 F. App'x 695, 696 (5th Cir. 2021) (per curiam).  First, courts "ask whether the plaintiff 'could have brought his claim under ERISA § 502(a)(1)(B).' " *Id.* (quoting *Davila*, 542 U.S. at 210).  Courts also "consider[ ] whether an individual could bring an ERISA claim under the various other civil-enforcement provisions found in ERISA § 502(a), not just § 502(a)(1)(B)." *See Ford*, 388 F. Supp. 3d at 699–700 (citations omitted); *see also McGowin v. ManPower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004) ("Complete preemption exists when a remedy falls within the scope of or is in direct conflict with ERISA § 502(a), and therefore is within the jurisdiction of federal court." (cleaned up)).

Section 502(a) of ERISA allows a civil enforcement action to be brought:

> (a) . . .
>
> (1) by a participant or beneficiary-- . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
> . . .
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; . . .

29 U.S.C. § 1132(a).

Courts "answer" the first *Davila* "question by identifying what the plaintiff is truly 'complain[ing] . . . about.' " *Advanced Physicians, S.C.*, 859 F. App'x at 696 (quoting *Davila*, 542 U.S. at 211). "If the 'only action complained of' is the 'denial[ ] of coverage promised under the terms of [an] ERISA-regulated employee benefit plan[ ],' *Davila*'s first requirement is satisfied." *Id.* (quoting *Davila*, 542 U.S. at 211).

Second, the Court "ask[s] whether the plaintiff's suit implicates a 'legal duty . . . independent of ERISA or the plan terms.' " *Id.* (quoting *Davila*, 542 U.S. at 210). The Court "answer[s] that question by reviewing the plaintiff's allegations alongside the state law on which they are based." *Id.* (citing *Davila*, 542 U.S. at 211–13). "If 'interpretation of the terms of [a] benefit plan[ ] forms an essential part' of the plaintiff's claim, *Davila*'s second requirement is satisfied." *Id.* (quoting *Davila*, 542 U.S. at 213).

"[C]omplete preemption is jurisdictional and confers federal question jurisdiction[.]" *Sadeghi v. Aetna Life Ins. Co*., 564 F. Supp. 3d 429, 451 (M.D. La. 2021) (citing *Giles*, 172 F.3d at 337). "Further, '[c]omplete preemption makes a purportedly state-law cause of action inherently federal; there is no way to "forego" bringing it as a federal claim . . . . A party cannot simply

change the label of a claim and thereby bring it out of the scope of ERISA complete preemption.' " *Id.* (quoting *Center for Restorative Breast Surgery, L.L.C. v. Humana Health Benefit Plan of La., Inc.*, No. 10-4346, 2011 WL 1103760, at *4 (E.D. La. Mar. 22, 2011)). Ultimately, "Section 502, by providing a civil enforcement cause of action, completely preempts any state cause of action seeking the same relief, regardless of how artfully pleaded as a state action." *Ford*, 388 F. Supp. 3d at 701 (quoting *Giles*, 172 F.3d at 337).

### 2. Analysis

Having carefully considered the matter, the Court finds that Plaintiff's claims are completely preempted by ERISA. As to the first *Davilla* prong, the heart of Plaintiff's complaint is that he is not receiving those benefits which he believes are due to him under the terms of the Plan. In his *Petition,* Labat specifically alleges that he is "entitled to damages including, but not limited to, the increased cost of his health care due to the fact that Shell . . . has now, contrary to its prior statements and promises that [he] would be eligible for a Company-sponsored medical plan, denied him such eligibility. . ." (*Pet.* ¶ 20, Doc. 1-1.) Further, again, Labat avers in his *Petition* and *Declaration*:

> As a result of Shell['s] . . . change in Mr. Labat's stated date of hire for purposes of calculating his eligibility for continuance of a Company-sponsored medical plan there was a $93,000 shortfall for what he had budgeted for his future health insurance based upon the representations i.e. promises of Shell . . .

(*Id.* ¶ 18; *see also Labat Decl.* ¶ 17, Doc. 18-1.) Likewise, the essence of Plaintiff's complaint is clear from his November 2020 appeal to the Plan Administrator wherein he claimed he should have received the pre-2006 subsidy formula and wherein he stated, "I would like to officially appeal this decision / conclusion that I fall into the Jan 1, 2006 rule for retirement and benefits. I am requesting that I should be part of the pre Jan 1, 2006 retiree and benefits plan." (*SUMF* ¶ 44,

Doc. 14-1; *see also id.* at ¶¶ 42–50.).  All of this confirms that, at its heart, Plaintiff's claims center

on benefits he claims were wrongfully denied.

Further, interpretation of the Plan forms an essential part of Plaintiff's detrimental reliance

and fraud claims.  Specifically, the Court cannot determine the falsity of Shell's employees'

representations or the reasonableness of Labat's reliance on same without first analyzing:

(1) the Plan Administrator's sole authority under the Plan to interpret the Plan and
    determine the eligibility of benefits, (*SUMF* ¶¶ 7–8, Doc. 14-1 (quoting Plan § 10.2–
    10.3, Doc. 9-1 at 81–82));[6]

---

[6] Specifically, Section 10.2 of the Plan, which is entitled Discretion to Interpret Plan, expressly states:

> The Plan Administrator will have full and absolute discretion to construe and
> interpret all provisions of the Plan and the Component Programs, including the
> discretion to resolve ambiguities, inconsistencies, or omissions conclusively;
> provided, however, that all such discretionary interpretations and decisions will
> be applied in a uniform and nondiscriminatory manner to all Participants,
> beneficiaries, and Covered Dependents who are similarly situated. All decisions
> of the Plan Administrator upon all matters within the scope of its authority will
> be binding and conclusive upon all persons.

(*SUMF* ¶ 7, Doc. 14-1.)  Further, Section 10.3 of the Plan, entitled Powers and Duties, expressly states in pertinent
part:

> Except as otherwise specifically provided by the applicable Component Program
> Document, in addition to the powers described in Section 10.2 and all other
> powers specifically granted under the Plan, the Plan Administrator will have all
> powers necessary or proper to administer the Plan and to discharge its duties under
> the Plan, and it will have full and absolute discretion in its exercise thereof. The
> Plan Administrator, functioning through the Manager, Health and Welfare or
> successor position thereto, will have the responsibility:
> * * *
> (j) To interpret the Plan and to determine all questions arising in the
> administration, interpretation and application of the Plan, including, but not
> limited to, those concerning eligibility for benefits and the construction of
> disputed or doubtful terms, in his sole discretion. All determinations and
> interpretations will be conclusive and binding on all parties including the
> Employees, Participants, Dependents, Employers and fiduciaries, subject to the
> provisions of the Plan and Trust and applicable law;
> * * *
> (s) To make benefits claims determinations for claims submitted by Participants,
> to the extent not delegated to a Claims Administrator under the applicable
> Component Program Document

(*Id.* ¶ 8.)

(2) the fact that, under the Plan, Participants cannot rely on oral statements by others which contravene the written terms of the Plan, (*SUMF* ¶ 12, Doc. 14-1 (quoting Plan § 11.1, Doc. 9-1 at 88));[7]

(3) the significance of the fact that LOOP was never a Participating Employer under the Plan, (*see SUMF* ¶¶ 27–31, 41, 45, 49–50, 52, Doc. 14-1); and

(4) the provisions of the Plan documents, including the 2006 SMM to the SPD, which analyze the January 1, 2006, amendment to the Plan, lay out who falls under the pre-2006 subsidiary formula and who falls under the 2006 subsidiary formula, and describe the distinction between years of Accredited Service and Eligibility Service, (*SUMF* ¶¶ 15–16, 21–26, Doc. 14-1; 2006 SMM, Doc. 9-2 at 14);

Phrased another way, to calculate Plaintiff's damages (i.e., wrongfully denied benefits), the Court must interpret the Plan and its documents and determine whether the pre-2006 subsidy formula applies and thus what benefits to which Plaintiff is in fact entitled.

Again, "Section 502, by providing a civil enforcement cause of action, completely preempts any state cause of action seeking the same relief, regardless of how artfully pleaded as a state action." *Ford*, 388 F. Supp. 3d at 701 (quoting *Giles*, 172 F.3d at 337). Because Plaintiff could have asserted his claims under § 502(a), and because an essential part of Plaintiff's claims requires an interpretation of the Plan, both *Davila* requirements are satisfied. Thus, Plaintiff's

---

[7] Specifically, Section 11.1 of the Plan, titled Right to Amend, provides:

> Benefits under the Plan are neither "vested" nor "accrued." Notwithstanding any provision of any other communication, either oral or written, made by the Employer, the Plan Administrator, a Third Party Administrator, or any other individual or entity to Employees, to any service provider, or to any other individual or entity, the Company reserves the absolute and unconditional right to amend the Plan and any or all of its Component Programs, at any time, prospectively or retroactively, on behalf of itself and each Participating Employer, including the right to reduce or eliminate benefits provided pursuant to the provisions of the Plan or any Component Program in accordance with applicable law including PPACA. . . . Any oral statements or representations made by the Employer, a Third Party Administrator, or any other individual or entity that alter, modify, amend, or are inconsistent with the written terms of the Plan will be invalid and unenforceable and may not be relied upon by any Participant, Employee, beneficiary, Dependent, service provider, or other individual or entity.

(*SUMF* ¶ 12, Doc. 14-1.)

claims are completely preempted. *See McGowin*, 363 F.3d at 558–59 (affirming finding of complete preemption because (1) plaintiff "may characterize her cause of action as arising under the common law of fraud, but she seeks a determination of her eligibility for benefits under an ERISA-governed plan, and she prays for relief specifically provided by § 502(a)(1)(B)"; and (2) "a court could not find fraudulent [employer's] representations that [the plaintiff was] not eligible for benefits without first determining whether the statement [was] truthful, i.e., without clarifying [the plaintiff's] right to benefits under the plan."); *Ford*, 338 F. Supp. 3d at 700–01 (finding plaintiff's claim of negligent misrepresentation and for "reliance damages" to be completely preempted because "the Court will have to interpret, at least in part, his purported beneficiary status under the Policy" and because, while "Plaintiff may characterize his cause of action as arising under negligent misrepresentation, [ ] he seeks a determination of his eligibility for benefits under an ERISA-governed plan, and he prays for relief specifically provided by § 502(a)(1)(B) or § 502(a)(3)."); *cf. Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 451–52 (5th Cir. 2013) (allowing ERISA § 502(a)(3) breach-of-fiduciary-duty claim where plaintiff alleged that defendant "represent[ed] that he was eligible for plan benefits for the remainder of his life by opting for early retirement" and that plaintiff "detrimentally relied on the misrepresentations" (cited with approval by *Ford*)).

### C.  Conflict Preemption

#### *1. Applicable Law*

"Conflict preemption does not provide grounds for removal but instead functions solely as an 'affirmative federal defense to a state-law claim.' " *Ford*, 388 F. Supp. 4d at 701 (quoting *Westfall v. Bevan*, No. 08-996, 2009 WL 111577, at *4 (N.D. Tex. Jan. 15, 2009) (citing *Giles*, 172 F.3d at 337)). "Conflict preemption under ERISA arises under § 514(a), codified at 29 U.S.C.

§ 1144(a), which preempts 'any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan. . . .*" Id.* (quoting 29 U.S.C. § 1144(a) (emphasis added by *Ford*)).  "A state cause of action 'relates to' an employee benefits plan when it maintains a 'connection with or reference to such plan.' " *Gonzales v. Metro. Life Ins. Co.*, No. 20-1022, 2020 WL 4698977, at *5 (E.D. La. Aug. 13, 2020) (Vance, J.) (quoting *Hubbard v. Blue Cross & Blue Shield Ass'n.*, 42 F.3d 942, 945 (5th Cir. 1995)).  Courts look at two factors in assessing whether state-law claims "relate to" a plan:

> (1) whether the state law claims address areas of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) whether the claims directly affect the relationship among the traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries.

*Ford*, 388 F. Supp. 3d at 701–02 (quoting *Woods*, 459 F.3d at 602).

As to the first factor, "[t]he Fifth Circuit has held that when the 'facts underlying a state law claim bear *some* relationship to an employee benefit plan, we evaluate the nexus between ERISA and state law in the framework of ERISA's statutory objectives." *Id.* at 702 (quoting *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 432 (5th Cir. 2004) (emphasis in *Mayeaux*)).  "Congress' purpose in enacting ERISA was 'to promote the interests of employees and their beneficiaries in employee benefit plans, . . . and to protect contractually defined benefits.' " *Sadeghi*, 564 F. Supp. 3d at 453 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations and quotations omitted)).

"The Supreme Court cautioned, however, that it has addressed claims of ERISA pre-emption with the starting presumption that Congress did not intend to supplant state law," and "lawsuits against ERISA plans for commonplace, run-of-the-mill state-law claims - although obviously affecting and involving ERISA plans - are not preempted by ERISA." *Id.* (cleaned up);

*see also Bennett v. Libbey Glass, Inc.*, No. 15-105, 2015 WL 5794523, at *5 n.11 (W.D. La. Sept. 30, 2015) ("The types of claims which are not preempted by ERISA are 'run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan.' " (quoting *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 833 (1988)).

Nevertheless, "ERISA's 'objectives include establishing uniform national safeguards "with respect to the establishment, operation, and administration of [employee benefit] plans," and "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." ' " *Ford*, 388 F. Supp. 3d at 702 (quoting *Mayeaux*, 376 F.3d at 420 (quoting 29 U.S.C. § 1001(a), (b))).

> Thus, based on these objectives, ERISA provides a comprehensive civil-enforcement scheme, which for example allows a beneficiary to sue to "recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan . . . " ERISA § 502(a)(1)(B); or alternatively, to obtain injunctive or "other appropriate equitable relief" to remedy violations of ERISA or terms of a benefit plan, or to enforce ERISA or terms of a benefit plan. *Id*. § 502(a)(3).

*Id.*

As to the second factor, "[c]ourts are more likely to find that a state law relates to a benefit plan if it affects relations among the principal ERISA entities—the employer, the plan, the plan fiduciaries, and the beneficiaries—than if it affects relations between one of these entities and an outside party. . . ." *Id.* (quoting *Memorial Hosp. Sys. v. Northbrook Life Ins. Co*., 904 F.2d 236, 249 (5th Cir. 1990)). That is to say, when the "claim for relief directly affects the relationship between two of the most traditional ERISA entities—a plan sponsor/employer and a beneficiary—" this "weighs heavily in favor of finding that the claim is subject to conflict preemption." *Id.* (citing *Memorial Hosp.*, 904 F.2d at 249).

"The Supreme Court interprets ERISA § 514(a) broadly." *Gonzales*, 2020 WL 4698977, at *5 (citing *Met. Life Ins. v. Massachusetts*, 471 U.S. 724, 737 (1985)). "[P]reempted state law includes any state law cause of action as it relates to an employee benefit plan, even if it arises under a general law which in and of itself has no connection to employee benefit plans." *Id.* (quoting *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1218–19 (5th Cir. 1992)).

### 2. Analysis

Having carefully considered the matter, the Court finds that, even if there was no complete preemption, there would be conflict preemption.  In short, both of the above factors are satisfied.

First, as explained above, Plaintiff's claims essentially involve the right to receive benefits under the terms of the Plan and the Special Severance Plan, and this is an "area of exclusive federal concern." *Ford*, 388 F. Supp. 3d at 701–02; *see also Sadeghi*, 565 F. Supp. 3d at 453.  As *Ford* stated, ERISA's objectives involve establishing both unform national safeguards concerning the administration of employee benefit plans and standards governing same, and this is precisely why ERISA established a civil-enforcement scheme under Section 502(a) to protect beneficiary's interests. *See Ford*, 388 F. Supp. 3d at 701–02. And, by analogy to *Ford*, the Court's job is to determine whether Shell, as a Participating Employer under the Plan, was "liable under ERISA for allegedly providing false or misleading information as to Plaintiff's . . . status" under the Plan, and "[t]hese  allegations, although framed in terms of" fraud and detrimental reliance, "go to the core of ERISA's safeguarding objectives." *See id.*

Indeed,"[t]he Fifth Circuit has found that preemption through ERISA extends as far as state law claims for misrepresentation of plan benefits, wrongful death, and for detrimental reliance." *Bennett*, 2015 WL 5794523, at *5 (citing *King v. Bluecross Blueshield of Alabama*, 439 F. App'x 386, 389 (5th Cir. 2011); *Corcoran v. United Healthcare. Inc.*, 965 F.2d 1321 (5th Cir. 1992),

*abrogated on other grounds by Rogers v. Hartford Life & Acc. Ins. Co.*, 167 F.3d 933, 944 (5th Cir. 1999)). For the same reasons, the Court finds that the first factor for conflict preemption is satisfied. *See id.* (finding that plaintiff's claims, including for fraud and detrimental reliance, were subject to conflict preemption because she "repeatedly refer[red] to her retirement plan . . . [i]n her petition;" her "claims rely upon her being owed retirement benefits under a retirement plan with [d]efendant;" and "[b]ecause the funds sought by [p]laintiff [were] governed by an ERISA plan, granting the relief sought by [p]laintiff would require the Court to evaluate the ERISA plan and determine what benefits [p]laintiff [wa]s owed."); *Lightfoot v. Bellsouth Telecomm., Inc.*, No. 04-1017, 2004 WL 2381533, at *1–3 (E.D. La. Oct. 22, 2004) (finding that detrimental reliance claim based on alleged oral promises "related to" an involuntary severance plan because plaintiff was "in essence seeking benefits under [that] Plan").

Likewise, the second prong of conflict preemption is satisfied, for "the claims directly affect the relationship among the traditional ERISA entities." *Ford*, 388 F. Supp. 3d at 702. It is not seriously disputed that Shell adopted the Plan and is a Participating Employer under the Plan and that Labat became a Participant in the Plan when he was hired by Shell. (*SUMF* ¶¶ 5, 27, Doc. 14-1; *see id.* at ¶¶ 4–5; *see also* Special Severance Plan, Doc. 14-3 at 19 (listing Shell as Plan Sponsor).) Thus, the second factor in conflict analysis is satisfied. *See Gonzales*, 2020 WL 4698977, at *5 ("the right to receive benefits under the terms of an ERISA plan affects the relationship between traditional ERISA entities: the plan and a participant, Gonzales."); *Bennett*, 2015 WL 5794523, at *5 ("The second prong is clearly satisfied as well, because Plaintiff seeks recovery from James Bennett's employer as a beneficiary of the plan."); *see also Ford*, 388 F. Supp. 3d at 702–03 ("Plaintiff is thus a beneficiary suing the successor to Decedents' employer

and plan sponsor in an attempt to recoup life-insurance proceeds he believes he was wrongfully denied.").

Accordingly, the Court also finds conflict preemption of Plaintiff's claims.  On this additional ground, Defendant's motion could be granted.

### D.  Plaintiff's Arguments Are Unavailable

Labat asserts a number of factual and legal challenges to Shell's position, but the Court finds each of these unavailing.  With respect to the facts, Plaintiff avers that he never received the July 1, 2006, Amendment or the SMM to the SPD. (*Labat Decl.* ¶¶ 4–6, Doc. 18-1.)  But, Plaintiff has failed to argue how, as a matter of law, any such failure would somehow affect the issue of preemption.

Likewise Plaintiff denies that the Special Severance Plan is "expressly governed by ERISA" but rather "only states that participants including Mr. Labat have rights under ERISA." (*PRSUMF* ¶ 33, Doc. 18-3.)  Other parts of the document, however, support Shell's position that the agreement is in fact governed by ERISA.

More specifically, in the section entitled "Claims under the Plan," the Special Severance Plan provides that, if a claim is denied, the Human Resources Department will give the claimant written notice of the denial within a certain time, and that notice will include "a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following an adverse benefit determination on review." (Special Severance Plan, Doc. 14-3 at 17.)  Likewise, if a claimant appeals, the Plan Administrator issues a decision on review which includes "a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA." (*Id.* at 18.)  Even stronger, the Special Severance Plan provides:

**ADDITIONAL INFORMATION**

The following information is provided as required by the Employee Retirement Income Security Act of 1974, as amended (ERISA):

<u>Plan Sponsor;</u>       Shell Pipeline Company LP
150 N. Dairy Ashford
Houston, TX  77079

<u>EIN</u>          52-2074531

<u>Plan Number</u>      908

<u>Plan
Administrator</u>    Shell Oil Company, acting through the VP HR Policy and
Benefits
P. O. Box 2463
Houston, Texas 77252-2463

Service of legal process may be made upon the Plan Administrator.

The Plan is administered by the Plan Administrator who has the exclusive authority to control and manage the operation and administration of the Plan and discretion to interpret Plan provisions.  Any interpretations shall be final, conclusive, and binding, and the Plan Administrator's decision will be given deference in the event the determination is subject to judicial review.

<u>End of Plan Year
(ERISA reporting)</u>   December 31

This document is only a summary of the terms of the Plan and does not attempt to cover all of the details contained in the official Plan Instrument.  If any part of this Summary Plan Description shall be determined to conflict with the Plan Instrument, the Plan Instrument shall control.

(*Id.* at 19.)  Thus, aside from the "Statement of Participants' Rights under ERISA" referenced by Plaintiff, (*id.* at 20), other parts of the Special Severance Plan also confirm it is governed by ERISA.  And to the extent Plaintiff argues that, as a matter of law, the Plan is not covered by ERISA, *see Bennett*, 2015 WL 5794523, at *3–5 (providing analysis of applicability of ERISA to plan), that argument is waived for failure to adequately brief, *see Payton v. Town of Maringouin*, No. 18-563, 2021 WL 2544416, at *26 (M.D. La. June 21, 2021) (deGravelles, J.) (collecting authorities on issue of waiver and finding same (citing, *inter alia*, *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (stating that, "[t]o avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases' " and holding that, because appellant "fail[ed] to do either with regard to its underlying claims, . . . those claims [were] inadequately briefed and therefore waived." (citations omitted)); *El–Moussa v. Holder*, 569 F.3d

250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones."))), *aff'd*, No. 21-30440, 2022 WL 3097846 (5th Cir. Aug. 3, 2022).

Finally, the Court has reviewed Plaintiff's efforts to distinguish Shell's authority. (*See* Doc. 18 at 11–19.) But, based on the cases cited and discussed above, the Court finds complete and conflict preemption in this case. Consequently, Shell's motion must be granted.

### E. Consequence of Preemption Finding and Leave to Amend

"The Fifth Circuit has not expressly determined the appropriate disposition of a claim that is completely preempted." *Gonzales*, 2020 WL 4698977, at *4 (citing *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 598 n.62 (5th Cir. 2015); *Ford*, 388 F. Supp. 3d at 703). "There are two possible approaches. Under the approach taken by the Second Circuit and most district courts in the Fifth Circuit, complete preemption 'results in the dismissal of the state-law claim.' " *Id.* (quoting *Spear Mktg., Inc.*, 791 F.3d at 598 n.62 (quoting *Encompass Office Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 949 (E.D. Tex. 2011) (citing *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 308-09 (2d Cir. 2004)))); *see also Ford*, 388 F. Supp. 3d at 704 (highlighting *Spear Mktg., Inc.*, split but noting that "courts in this circuit appear to be leaning toward the dismissal approach"). *But see Gonzales*, 2020 WL 4698977, at *4 ("Alternatively, at least one court has recharacterized a state claim as a properly asserted federal claim and proceeded to adjudicate it on the merits." (citing *Spear Mktg., Inc.*, 791 F.3d at 598 n.62 (citing *Kersh v. UnitedHealthcare Ins. Co.*, 946 F. Supp. 2d 621, 630 (W.D. Tex. 2013)).

The Court agrees with the majority approach, particularly in light of Plaintiff's representations that he does not seek leave to amend and is not asserting an ERISA claim.

Consequently, the Court will dismiss Plaintiff's state law claims. *See Gonzales*, 2020 WL 4698977, at \*4–5 (concluding that "the appropriate result [was] dismissal of the claim"); *Ford*, 338 F. Supp. 3d at 704 (opting to dismiss as "the better option because both complete and conflict preemption apply to bar Plaintiff's state-law negligent misrepresentation claim.").

On the issue of amendment, in Shell's original memorandum, Shell wrote extensively about how Plaintiff could not assert an ERISA estoppel claim and how Plaintiff's claims should be dismissed with prejudice. (*See* Doc. 14-2 at 20–31.)  In response, Plaintiff stated that he does not seek to amend his claims and that he is not asserting an ERISA estoppel claim. (Doc. 18 at 12.)

But, Plaintiff did so without a ruling from this Court finding complete and conflict preemption.  Thus, while Plaintiff could be deemed to waive any argument for or claim of ERISA estoppel, given the complexities of ERISA and the lack of any previous amendment, the Court will give Plaintiff the benefit of the doubt and allow one opportunity to cure the defects of his *Petition* to assert a claim under ERISA. *See Murray v. LeBlanc*, No. 21-592, --- F. Supp. 3d ----, 2022 WL 4361738, at \*23 (M.D. La. Sept. 20, 2022) (deGravelles, J.) (collecting authorities on the "wise judicial practice" of granting at least one opportunity to amend to cure deficiencies of pleadings, and granting same when plaintiffs had not previously amended in response to a ruling by the court (citations omitted)); *see also id.* at \*21 n.5 (noting possibility of amendment even on issue deemed waived).

However, the Court reminds Plaintiff of his obligations under Federal Rule of Civil Procedure 11; particularly considering the arguments made by Shell in its brief, (Doc.14-2 at 20–31), any amendment should satisfactorily respond to Shell's position on ERISA estoppel.  If the Court determines that an amendment was submitted frivolously, it will consider an award of sanctions.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that *Shell's Motion for Summary Judgment* (Doc. 14) filed by Defendant, Shell Pipeline Company LP, is **GRANTED**, and all claims by Plaintiff Richard Labat against Shell are **DISMISSED WITHOUT PREJUDICE.**  Plaintiff shall be given twenty-eight (28) days in which to amend the *Petition* to assert a viable claim under ERISA.  Failure to do so will result in the Court entering judgment in favor of Shell.

Signed in Baton Rouge, Louisiana, on <u>March 17, 2023</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**